**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUNIUS J. JOYNER, III,

    *Plaintiff*,

  v.

MORRISON & FOERSTER LLP *et al.*

    *Defendants*.

Civil Action No. 20-1440 (TJK)

## <u>MEMORANDUM OPINION</u>

Before the Court is Plaintiff Junius J. Joyner's fourth attempt to plead claims against a professional staffing firm for which he worked as a contract attorney, the law firm client to which he was assigned, and several employees of those firms.  In his Third Amended Complaint, Plaintiff—an attorney proceeding pro se—raises race-discrimination and hostile-work-environment claims under Title VII and 42 U.S.C. § 1981.  He also alleges that he was wrongfully discharged for reporting suspected antitrust violations contrary to public policy.  Defendants move to dismiss.  Despite his efforts, Plaintiff has failed to state a claim against any defendant.  Thus, the Court will grant Defendants' motion and dismiss the complaint with prejudice.

I.  **Background**

  A.  **Facts**

According to the Third Amended Complaint, Defendant Mestel & Company New York LLC ("Hire Counsel") is a professional staffing firm that provides attorneys for temporary assignments to its law firm clients.  Third Am. Compl., ECF No. 31 ("TAC") ¶ 4.  In July 2019, Hire Counsel assigned Plaintiff, a black attorney, to the Washington, D.C., office of Defendant Morrison & Foerster LLP ("MoFo") to provide antitrust counsel on a transaction involving one of

MoFo's telecommunication clients. *See id.* ¶¶ 16, 20. But from the moment Plaintiff walked through MoFo's doors, he claims, the firm subjected him to disparate treatment because he is black. *See id.* ¶¶ 19–20.

On Plaintiff's first day, Defendant Evan Harris, a MoFo associate, provided him with "Integration Management" training. TAC ¶ 19. Plaintiff alleges that during the training, Harris, a white man, "referred to prepaid wireless customers as [being] 'low class' or 'lower class' than postpaid wireless customers." *Id.* Plaintiff alleges that Harris intended "to intimidate, ridicule, humiliate, and insult" him because Harris "knew from his work on the telecommunications merger that statistical data . . . showed a large percentage of prepaid customers were African-American," and he had told Harris that he was such a customer. *See id.* ¶¶ 19–20. In response to this comment, Plaintiff allegedly chose to "alter his work schedule by working less hours and receiving less compensation." *Id.* ¶ 21.

In addition, Plaintiff alleges, MoFo did not assign him to "a particular workstream, . . . as was customary for team members" for almost three months. TAC ¶ 22. Instead, Defendant Natalie Fleming Nolen, a MoFo partner, "directed [him] to work on integration calls not previously assigned to specific integration team members." *Id.* The complaint does not provide details about what Plaintiff means by "particular workstream" or what made the calls MoFo assigned to him different than those that would have come through a "workstream." To explain the consequences of this assignment, Plaintiff asserts only that he "was denied the ability to take integration calls that had previously been assigned to employees on existing teams," and he could not "take phone calls as early or as late as attorneys assigned to workstreams," which "dramatically reduced the number of hours that Plaintiff could work[,] . . . reduc[ing] his ability to earn compensation." *Id.* ¶ 23. Plaintiff does not state why he was unable to "take phone calls" at the

same times as other employees or explain whether that inability stemmed from his lack of "workstream" or his own decision to reduce his working hours.  *See id.* ¶¶ 21, 23.

In any event, Plaintiff alleges that MoFo assigned two white attorneys who joined the firm during his tenure, "Co-Worker 1 and 2," to workstreams just after their arrival.  TAC at 6 n.2.  He also alleges that "Co-Worker 3," a white attorney who joined the team before he did, also received an immediate assignment to a workstream.  *Id.*  Plaintiff asserts that "all attorneys that were non-protected class members hired through Hire Counsel were immediately assigned to workstreams," but he does not allege whether those placements were at MoFo or if it was Hire Counsel that placed Co-Workers 1, 2, or 3 with MoFo.  *See id.*

Plaintiff suffered other purported mistreatment by several coworkers, but he does not allege that these coworkers held leadership or supervisory positions at MoFo.  First, Plaintiff describes several exchanges he perceived as racially charged after MoFo assigned him to work in a conference room with three white attorneys.  TAC ¶ 25.  He claims these unidentified attorneys subjected him to "several direct and indirect forms of racism."  *Id.*  He points to three examples. One time, Plaintiff alleges, one called him "Boy."  *Id.*  Another time, he alleges that other attorneys in the conference room referred to white college students who posted a photo on social media posing with rifles in front of Emmett Till's memorial as "stupid"—but that "the tone and spirit of this conversation suggested the . . . racist behavior . . . was not the problem, only the failure to show anonymity."  *Id.*  And several times, he says, these attorneys discussed "Civil War reenactments that were hosted at one attorney's home."  *Id.* ¶ 26.  He also claims that another unidentified white coworker would not respond when he said, "good morning."  *Id.* ¶ 27. And finally, he alleges that a black secretary, whose desk was close to the conference room, once

asked Plaintiff "how he could stand to be in that room." *Id.* ¶ 28.  Because of these events, Plaintiff, on his own initiative, temporarily moved to a conference room on another floor.  *Id.* ¶ 31.

Plaintiff does not allege that his purported supervisor at MoFo, associate Harris, participated in any of this alleged mistreatment.  But he says that Harris "had constructive notice and was aware of the prior racist conversations and did nothing to prevent or stop them" because (1) his office was closer to the conference room than the secretary's; and (2) when Plaintiff moved back down to his old floor a month after relocating, Harris said, "We don't want you down there!"  TAC ¶¶ 28–29.  Other than that, Plaintiff does not allege that he reported the offensive comments to anyone at MoFo—only to Defendant Patti Ayala, Hire Counsel's Vice President of Human Resources.  *Id.* ¶ 52.

Plaintiff also alleges he suffered racially motivated harassment by Co-Worker 1, a white female.  TAC ¶ 32.  He alleges that Co-Worker 1 threw headphones at him, pounded her fists on a desk while yelling at him, told him he "did not know 'his place' and he was only there because of Affirmative Action," and made "unsubstantiated complaints" about him.  *Id.* ¶ 32 & n.5.  He also says Co-Worker 1 filed lawsuits against him in District of Columbia Superior Court, and Plaintiff alleges he had to "endure[] two trials on the matter, both being dismissed."  *Id.* ¶ 32 & n.6; *see also* ECF No. 31-2.  Plaintiff's allegations about MoFo's response are somewhat at odds.  On the one hand, he alleges that he reported the harassment to Harris and Nolen, "but instead of reprimanding Co-Worker 1 . . . [MoFo] cast [Plaintiff] as a danger to women."  *Id.* ¶ 33.  Nolen apparently instructed Plaintiff "not to appear in any areas were [sic] Co-Worker 1 was present," and another of Plaintiff's female coworkers "was removed from [his] work area" against her will.  *Id.* ¶ 34.  He alleges that "[n]ot only did [MoFo] fail to remedy the sexual and racial harassment perpetrated on [him] because of his race, color, and sex, the actions and policy instituted by

[MoFo] gave Co-Worker 1 license and authority to continue this harassing behavior."  *Id.* ¶ 35. But on the other hand, Plaintiff also alleges that Co-Worker 1's allegations "were found to be un-true" after "thorough[] vetting and multiple . . . interview[s]," and MoFo terminated Co-Worker 1 because of them.  *Id.* ¶¶ 32 n.6, 34, 36, 52.

Plaintiff also levels related allegations against Hire Counsel.  To comply with an unspeci-fied "court order" related to Co-Worker 1's lawsuit against him, he alleges that he "requested and received approval from [MoFo] to work from home until the trial date, approximately three days working remote." TAC ¶ 57.  But he says Hire Counsel denied the request.  *Id.*  He also al-leges that even though "Hire Counsel had authorized similar or longer remote work for Cauca-sian or non-protected class members," he "received threatening emails of termination from Mrs. Ayala."  *Id.* ¶ 58.  Plaintiff further alleges that MoFo authorized a two-week period for Co-Worker 1 to work remotely.  *Id.* ¶ 57.  Plaintiff does not allege whether Co-Worker 1 worked for Hire Counsel or whether Hire Counsel played any role in granting her request for remote work.

Plaintiff included Ayala's email as an exhibit to his complaint.  It explained that, because Hire Counsel was his employer (not MoFo), Plaintiff was supposed to submit "all employment matters," like a request for remote work, to Hire Counsel.  ECF No. 31-5.  The email concluded, "Consider this as a final warning on protocol to only engage your employer and not the client re-garding your schedule and other related employment matters . . . . Any future infraction will re-sult in disciplinary action up to and including removal from the assignment."  *Id.*

Plaintiff's stint with MoFo ended up being short-lived—he was fired after less than six months, in December 2019.  TAC ¶ 47.  But he alleges that his termination was unlawful for rea-sons other than racial discrimination.  The month prior, he began "investigating possible antitrust violations" related to the merger on which he was tasked.  *Id.* ¶ 38.  He questioned whether

certain "information being discussed on the integration calls was competitively sensitive." *Id.*

¶ 39.  He alleges that in December, he learned of a document with "competitively sensitive infor-

mation" that he thought had been improperly disclosed.  *Id.* ¶ 40.  He reported the disclosure to

two MoFo partners and an associate, but never received a response.  *Id.*  Instead, he "was sum-

marily fired within a week of reporting this potential violation."  *Id.*  Neither MoFo nor Hire

Counsel ever provided a reason for his termination.  *Id.* ¶ 45.  He also alleges that no one com-

municated to him that he had been fired until security escorted him off the premises when he ar-

rived at the office one day in mid-December.  *Id.* ¶¶ 47–48.

### B.    Procedural Background

In May 2020, Plaintiff sued MoFo and Hire Counsel, and they moved to dismiss the com-

plaint.  ECF No. 7.  Rather than respond to the motion, Plaintiff tried to file an amended com-

plaint.  ECF No. 9.  The Court denied him leave to do so because he did not seek leave to amend

under Federal Rule of Civil Procedure 15.  Minute Order of September 8, 2021.  Thereafter,

Plaintiff properly moved under Rule 15 to file a second amended complaint, adding Harris, No-

len, and Ayala.  ECF No. 12.  Defendants did not oppose the motion, but they again moved to

dismiss.  ECF No. 16.  And again, rather than oppose the motion, Plaintiff moved to file the

Third Amended Complaint.  ECF No. 23.  Defendants then filed their third motion to dismiss,

arguing that Plaintiff has still failed to state a claim.[1]  Plaintiff opposes.  *See* ECF Nos. 34, 41,

43.

---

[1] Consistent with the Court's prior order, Defendants first sought leave to file their motion under seal.  ECF No. 32.  The Court granted the motion and directed Defendants to file on the public docket a version of the motion redacting "information that the parties dispute is privileged or confidential."  Minute Order of March 10, 2021.  For ease of reference, the Court will cite the redacted motion at ECF No. 34 throughout this opinion, but it relied on the unredacted version at ECF No. 32-1 for its analysis.  The same goes for Plaintiff's opposition at ECF Nos. 39 (sealed)

## II.     Legal Standard

To "survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead 'enough facts to state a claim to relief that is plausible on its face' and to 'nudge [their] claims across the line from conceivable to plausible.'" *Didban v. Pompeo*, 435 F. Supp. 3d 168, 173 (D.D.C. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Courts reviewing a Rule 12(b)(6) motion "must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'"  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).

Additionally, although pro se plaintiffs typically enjoy relaxed pleading standards, courts hold attorneys who proceed pro se to the ordinary Rule 12(b)(6) requirements.  *Harrigan v. Carson*, No. 17-cv-930 (TJK), 2019 WL 4737119, at *1 n.1 (D.D.C. Sept. 28, 2019) (citing *Curran v. Holder*, 626 F. Supp. 2d 30, 33 (D.D.C. 2009)).  And "[e]ven at the Rule 12(b)(6) stage, a Court can review 'documents attached as exhibits or incorporated by reference in the complaint,' or 'documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.'"  *Hester v. Paul Public Charter School*, 21-cv-3166 (JEB), 2022 WL 35620, at *2 (D.D.C. Jan. 4, 2022) (citation omitted); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.").

---

and 43 (redacted), Defendants' reply at ECF Nos. 40 (sealed) and 42 (redacted), and Plaintiff's complaint at ECF Nos. 30 (sealed) and 31 (redacted).

### III.   Analysis

Plaintiff's Third Amended Complaint fails to state a claim.  First, his disparate-treatment claims fall short because he fails to allege facts sufficient to support a plausible inference that either MoFo or Hire Counsel took any action against him because of his race.  Second, his hostile-work-environment claims turn on his coworkers' conduct without plausibly alleging that his employer knew about but failed to control the harassment.  And in any event, his allegations otherwise do not show the sort of severe and pervasive harassment necessary to sustain a hostile-work-environment claim.  Third, as for his wrongful-discharge claim, the complaint identifies no clearly articulated public policy prohibiting the behavior he reported to MoFo, so his wrongful-discharge claim fails as well.

### A.   Disparate Treatment Claims (42 U.S.C. § 1981)

The complaint alleges that Plaintiff suffered two discrete, discriminatory acts in violation of 42 U.S.C. § 1981.  First, it alleges that MoFo treated him less favorably than his white counterparts by failing to assign him to a workstream soon after his arrival at the firm.  Second, it alleges that Hire Counsel subjected him to disparate treatment when it denied his request for remote work.  On both fronts, Plaintiff fails to allege enough facts to support a plausible inference of discrimination.

"Section 1981 bars private employers from discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment."  *Ruifang Hu v. K4 Solutions, Inc.*, No. 18-cv-1240(TSC), 2020 WL 1189297, at *6 (D.D.C. Mar. 12, 2020) (quoting 42 U.S.C. § 1981).  To state a claim under that statute, a plaintiff must plead only that he "suffered an adverse employment action" because of his race.  *Id.* (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008)).  Courts test § 1981 claims under the familiar *McDonnell Douglas* burden-shifting framework that has evolved in the Title VII context.  *McFadden v. Ballard Spahr Andrews &*

*Ingersoll, LLP*, 611 F.3d 1, 3 (D.C. Cir. 2010).  In disparate-treatment cases, a plaintiff's prima

facia case "consists a showing that '(1) the plaintiff is a member of a protected class; (2) [he]

suffered an adverse employment action;[2] and (3) the unfavorable action gives rise to an inference

of discrimination.'"  *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 255 (D.D.C. 2017)

(quoting *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006)).  If a plaintiff makes

that showing, "the burden 'must shift to the employer to articulate some legitimate, nondiscrimi-

natory reason for the' adverse action."  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802).  The

burden then shifts back to the plaintiff to show pretext.

    As for showing an inference of discrimination, a plaintiff's burden "at the pleading stage

is not onerous."  *Redmon v. YMCA of Metro. Wash.*, 417 F. Supp. 3d 99, 102 (D.D.C. 2019) (quo-

tation omitted).  One way a plaintiff might cross the threshold from speculation into plausibility is

---

[2] It was once well-settled in this Circuit that only employment actions resulting in "a sig-
nificant change in employment status, such as hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing significant change in benefits" were
sufficiently "adverse" to sustain a disparate-treatment claim under § 1981 and related antidiscrim-
ination statutes.  *Ruifang Hu*, 2020 WL 1189297, at *6 (quoting *Taylor v. Small*, 350 F.3d 1286,
1293 (D.C. Cir. 2003)).  Put another way, a plaintiff had to show the challenged action caused him
"objectively tangible harm."  *See Moore v. Ashcroft*, 401 F. Supp. 2d 1, 24 (D.D.C. 2005).  But
after the briefing was completed here, in *Chambers v. District of Columbia*, the D.C. Circuit dis-
pensed with the "objectively tangible harm" requirement as inconsistent with Title VII's text.  35
F.4th 870, 875 (D.C. Cir. 2022) (en banc).  Instead, "[o]nce it has been established that an employer
has discriminated against an employee with respect to that employee's 'terms, conditions, or priv-
ileges of employment' because of a protected characteristic, the analysis is complete."  *Id.* at 874–
75.  Although *Chambers* dealt with disparate-treatment claims under Title VII, Judge Moss re-
cently held, in a persuasive opinion, that its reasoning should be applied to § 1981, which the
Circuit has long held "should be construed in the same manner as Title VII."  *See Bain v. Off. of
Att'y Gen.*, No. 21-cv-1751 (RDM), 2022 WL 17904236, at *19 (D.D.C. Dec. 23, 2022) (applying
*Chambers* to claims under the Rehabilitation Act and Age Discrimination in Employment Act);
*McFadden*, 611 F.3d at 3 (applying Title VII standards to a § 1981 claim); *but see Blackmon v.
Garland*, No. 21-cv-0034 (FYP), 2022 WL 4130815, at *11 n.9 (D.D.C. Sept. 12, 2022) (refusing
to apply *Chambers* to an ADEA claim).  In any event, though, the Court need not decide this
question now, because Plaintiff has failed to state a claim for other reasons.

to allege he "was treated differently from similarly situated employees who are not part of the protected class." *Id.* (quotation omitted).  But to do so, "[a] plaintiff must . . . demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those of the [comparator]." *Id.* at 103 (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)).

The Court addresses each of Plaintiff's disparate-treatment claims in turn.  On both fronts, his claims fail because he has not alleged enough facts to support a plausible inference of discrimination.  Thus, the Court will dismiss these claims against all Defendants.[3]

### 1.    "Workstream" Claim Against MoFo

The Court begins with Plaintiff's claim that MoFo's failure to assign a "workstream" upon his arrival there was discriminatory.  Defendants argue at length that Plaintiff has not adequately pleaded an adverse employment action because "courts routinely find that a worker's receipt of less desirable job assignments is not actionably adverse to support a discrimination claim."  ECF No. 34 at 18 (collecting cases).  But whether anything of that principle survives *Chambers, see supra* note 2, is far from clear.  While the Circuit reiterated in that case that "not everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment'" such that it is actionable, *Chambers* ultimately rejected any "objectively tangible harm" requirement to hold that "discriminatory job transfers are actionable."  35 F.4th at 873, 882.  Moreover, Plaintiff has alleged something more than just a "less desirable" assignment: that MoFo's failure to assign him to a particular workstream materially affected his employment because he was not "able to take phone calls as early or as late as attorneys assigned to workstreams," thereby reducing

---

[3] The Court focuses on the claims against MoFo and Hire Counsel.  But because individual liability "can be imposed [only] for [a supervisor's] personal involvement in discriminatory activity *that violates Section 1981*," Plaintiff's claims against Harris, Nolen, and Ayala fail for the same reasons.  *Brown v. Children's Nat'l Med. Ctr.,* 773 F. Supp. 2d 125, 136 (D.D.C. 2011) (quotation omitted) (emphasis added).

the hours he could work and the compensation he could earn compared to his white counterparts. *See* TAC ¶ 23; ECF No. 43 ¶¶ 20, 23.  In any event, even assuming Plaintiff has adequately pleaded an adverse employment action, he has still failed to plausibly allege that MoFo delayed assigning him to a workstream because of his race.

Plaintiff's claim centers on one allegation that he says supports an inference of racial discrimination: that right around the time Plaintiff started there, MoFo assigned his three white coworkers to a workstream right after *their* arrival.  *See* TAC at 6 n.2.  He also asserts that "on information and belief, . . . all attorneys that were non-protected class members hired through Hire Counsel were immediately assigned to workstreams."  *Id.*  But even at the pleading stage, Plaintiff must do more than baldly assert he was treated differently than coworkers outside his protected class.  He must plausibly allege that he and these coworkers were similarly situated, meaning "that all of the relevant aspects of [his] employment situation were nearly identical to those of the [comparator]."  *Redmon*, 417 F. Supp. 3d at 103 (quoting *Holbrook*, 196 F.3d at 261).  He does not even try to do so.  For example, he does not allege whether MoFo hired these coworkers directly, through Hire Counsel, or another professional staffing firm.  *See* TAC at 6 n.2.  And even if the Court could reasonably infer from the complaint that they were in the same position as Plaintiff in that regard, Plaintiff is silent as to whether their antitrust experience resembled Plaintiff's; whether they handled the same sort of work as Plaintiff; or whether they shared a supervisor or received assignments from the same source.  *See id.*  And as for any other attorneys hired through Hire Counsel that he claims immediately received workstream assignments, Plaintiff does not even allege whether these attorneys were on his team.  *See id.*  In short, Plaintiff has not plausibly alleged that any of his proffered comparators "occup[ied] the same positions" or "performed the same

duties." *Black v. Guzman*, No. 22-cv-1873 (BAH), 2023 WL 3055427, at *9 (D.D.C. Apr. 24, 2023).  His failure to do so is fatal.  *See id.*

### 2.    Remote Work Claim Against Hire Counsel

Plaintiff's claim that Hire Counsel discriminated against him by denying his request for remote work is even more straightforwardly deficient.  As above, assuming that denying an employee the opportunity to work remotely for discriminatory reasons is actionable post-*Chambers*,[4] Plaintiff does not allege any facts from which the Court might plausibly infer that Hire Counsel was motivated by discriminatory intent.

Plaintiff tries to do so by alleging that Co-Worker 1—the white woman he claims harassed him, made false accusations against him, and filed frivolous lawsuits against him—received authorization to work remotely for two weeks.  Again, Plaintiff includes no other allegations suggesting that her experience, assignments, team or supervisors make her an apt comparator.  More fundamentally, Plaintiff's problem is that he does not allege that Hire Counsel employed Co-Worker 1 or authorized her to work remotely.  *See* TAC ¶ 57.  So even if Plaintiff and Co-Worker 1 were otherwise similarly situated, Plaintiff does not allege that *Hire Counsel* treated her more favorably.[5]

Plaintiff further claims that "Hire Counsel had authorized similar or longer remote work for Caucasian or non-protected class members."  TAC ¶ 58.  This allegation does not get the job

---

[4] *See Black*, 2023 WL 3055427, at *8 ("[T]he alleged suspension of plaintiff's telework benefits amounts to an adverse change to plaintiff's 'terms, conditions, or privileges of employment' because the revocation of those benefits forced her to work in person instead of remotely.").

[5] Plaintiff alleges that "all attorneys that were non-protected class members hired through Hire Counsel were immediately assigned to workstreams," and separately that Co-Worker 1 was assigned to a workstream.  TAC at 6 n.2.  But the Court cannot infer from those separate allegations that Hire Counsel employed Co-Worker 1 and authorized her remote work.  And even if it could, as explained above, Plaintiff makes no effort to allege that Co-Worker 1 was otherwise similarly situated to him, so the claim fails regardless.

done, either.  Plaintiff does not identify a single other employee for whom Hire Counsel authorized remote work, no less one that is similarly situated to him.  *See Harris v. Mayorkas*, No. 21-cv-1083 (GMH), 2022 WL 3452316, at *6 (D.D.C. Aug. 18, 2022) (dismissing discrimination claim where plaintiff alleged simply that "[s]imilarly situated co-workers outside of [her] race were not treated in the manner in which [she] was" (alterations in original)).[6]

### B.    Hostile Work Environment Claims (Title VII & 42 U.S.C. § 1981)

Plaintiff also brings hostile-work-environment claims under Title VII and § 1981 against MoFo and Hire Counsel.  He also asserts that Harris, Nolen, and Ayala bear individual liability for the hostile environment under § 1981.  Starting with MoFo, Plaintiff alleges only that he was harassed by coworkers—not supervisors.  Because he has not adequately pleaded that MoFo was negligent in addressing the offensive behavior, he cannot impute liability to the firm.  And in any event, his allegations, considered individually or collectively, do not show sufficiently severe and pervasive harassment to sustain a hostile-work-environment claim.  His allegations against Hire Counsel similarly fall far short of the standard for a hostile work environment.  Thus, the Court will also dismiss these claims against all Defendants.

To succeed on a hostile-work-environment claim, a "plaintiff must show that [he] was subjected to 'discriminatory intimidation, ridicule, and insult of such sever[ity] or pervasive[ness] [as]

---

[6] The Third Amended Complaint contains another allegation that Hire Counsel failed to investigate the discriminatory comments coworkers directed at him, and its failure to do so "and follow similar investigative procedures and policies" to those used to investigate Co-Worker 1's complaint against him "amounted to disparate treatment because of [Plaintiff's] race, color, and sex."  TAC ¶ 53.  But Plaintiff, deploying passive voice, obfuscates the fatal defect here.  As with the remote-work claim, Plaintiff does not allege that either the coworkers in the conference room or Co-Worker 1 worked for Hire Counsel.  Nor does he allege which entity—MoFo or Hire Counsel—investigated Co-Worker 1's complaint (though other allegations suggest it was MoFo).  Without that information, Plaintiff cannot show that Hire Counsel treated him differently than it treated any other employee—no less because of his race.

to alter the conditions of [his] employment and create an abusive working environment.'" *Jones v. District of Columbia*, 314 F. Supp. 3d 36, 55 (D.D.C. 2018) (quoting *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006)).  This is a "high bar" designed to "filter[] out complaints attacking the ordinary tribulations of the workplace" and prevent federal civil rights statutes from "imposing 'a general civility code.'" *Mohmand v. Broad. Bd. of Governors*, 2018 WL 4705800, at *6 (D.D.C. Sept. 30, 2018) (quoting *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016)).  To survive, the "constituent acts [of a hostile work environment claim] must be 'adequately linked' such that they form 'a coherent hostile environment claim.'" *Baird v. Gotbaum* ("*Baird II*"), 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting *Baird v. Gotbaum* ("*Baird I*"), 662 F.3d 1246, 1251 (D.C. Cir. 2011)).  The "kitchen sink" approach will not do.  *See Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 65–66 (D.D.C. 2012).

Additionally, an employer is not automatically liable for harassment between coworkers, even when its employees' conduct is otherwise severe enough to support a hostile-work-environment claim.  Rather, "in the Title VII context, . . . '[i]f the harassing employee is the victim's coworker,' as opposed to [his] supervisor, 'the employer is liable only if it was negligent in controlling working conditions.'" *Copeland v. Arklay LLC*, 273 F. Supp. 3d 69, 76 (D.D.C. 2017) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).  Nor does "Section 1981 . . . impose a generalized duty on employers to police social conditions of the workplace." *Id.*  So to impute liability for a coworker's harassment to the employer, a plaintiff must prove the employer "knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).

### 1.    MoFo

Plaintiff cobbles together several allegations in his effort to state a hostile-work-environment claim against MoFo.  He cites the following: (1) Harris's comment that prepaid wireless

subscribers were "low class"; (2) the delay in assigning him a workstream; (3) the racially dispar-aging comments in the conference room; (4) that a white coworker did not respond when he said "good morning"; (5) that a black coworker asked how he "could stand" to work in the conference room; (6) Harris's remark, "We don't want you down there!"; (7) the white, female coworker's harassment and "physical[] assault," to which MoFo responded by "overwhelmingly sid[ing] with said co-worker who was later terminated for making false accusations that were racially moti-vated"; (8) Ayala's "threat" via email after he requested remote work; and (9) MoFo's failure to inform him that he had been fired before he arrived at the office on December 12, which "create[d] a security and possible police situation." TAC ¶ 74.

Right off the bat, some of these allegations plainly do not support a hostile-work-environ-ment claim against MoFo. First, the Court has already explained that Plaintiff has not adequately alleged any basis to infer that the delay in assigning him to a workstream was discriminatory. So the same conduct can hardly support showing a race-based hostile work environment. *See Floyd v. Lee*, 85 F. Supp. 3d 482, 518 (D.D.C. 2015) ("[I]f a plaintiff could not prevail on a standalone . . . claim, the same alleged [discrete act] could not constitute 'severe or pervasive' harassment for purposes of a hostile work environment claim."); *Childs-Pierce v. Utility Workers Union of Am.*, 383 F. Supp. 2d 60, 77 (D.D.C. 2005) ("It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination." (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002))). Sec-ond, Ayala did not work for MoFo, so her email could not have contributed to a hostile environ-ment created by MoFo. And in any event, Plaintiff alleges that MoFo *granted* his request for remote work before Hire Counsel overrode its decision, because it was his actual employer. *See* TAC ¶ 58. Third, the secretary's comment expressing sympathy for Plaintiff is not harassment,

15

whatever it says about his claims against others.  And fourth, Plaintiff's allegation that MoFo "maliciously . . . creat[ed] a security and possible police situation" by not telling him that he had been fired before he arrived at the office on December 12 is not only speculative but belied by his own exhibits to his complaint.  *See* TAC ¶ 74; ECF No. 31-3 at 1 (MoFo staff expressing "concern[] . . . that [Plaintiff] was not notified" and planning to "escalat[e] [the issue] within [Hire Counsel]").

The claims that remain allege that Plaintiff suffered harassment at his coworkers' hands. But considered individually or collectively, they do not plead a hostile-work-environment claim against MoFo.

To be sure, Plaintiff asserts that Harris was his supervisor, not a coworker.  *See* TAC § C n.22.  But on the allegations here, the law says otherwise.  "[A]n employee is a 'supervisor' for purposes of vicarious liability under [employment-discrimination statutes] if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424.  "Those actions include, without limitation, 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Kennedy v. Buttigieg*, No. 19-cv-2212 (RDM), 2023 WL 2561822, at *11 (D.D.C. Mar. 17, 2023) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

To support his conclusory allegation that Harris "maintained supervisory authority over [him] because [Harris] had the authority to fire or cause a significant change in benefits," Plaintiff attached to his complaint an email Harris sent Nolen discussing Plaintiff's termination.  *See* TAC § C n.22; ECF No. 31-6.  But the email does not provide a factual basis for such an inference.  The email does not say who made the decision to fire Plaintiff or who had the power to do so—only

that Ayala asked Harris and Nolen to communicate it.[7]  *Cf. Kennedy*, 2023 WL 2561822, at *12 (finding evidence "would not permit a reasonable jury to find" that employee "had any authority over" the plaintiff where the employee, who was superior to plaintiff, "told her that she 'was going to be his assistant'" because "that assertion [said] nothing about who had the *authority* to determine Kennedy's assignment").  And there is nothing else in the Third Amended Complaint or the picture it paints of the work arraignment here that plausibly suggests that Harris, a MoFo associate, would have such authority.  *Cf. Iqbal*, 556 U.S. at 679 (explaining that a court, when "[d]etermining whether a complaint states a plausible claim for relief," may "draw on its judicial experience and common sense").  Without more, Plaintiff's allegations that Harris "provided [his] initial Integration Management training," TAC ¶ 19, or otherwise oversaw his work at the firm are not enough to prop him up as a "supervisor" to impute liability for any discriminatory conduct to MoFo.  *See Vance*, 570 U.S. at 432 ("supervisors" under Title VII do not include "those who, although lacking [the authority to make tangible employment decisions], nevertheless have the ability to direct a co-worker's labor to some ill-defined degree").

Thus, the Court must consider whether MoFo may be vicarious liability for what amounts to harassment committed by Plaintiff's coworkers.  But the only behavior for which Plaintiff plausibly alleges MoFo had notice involved Co-Worker 1.  In particular, he alleges he told Harris and Nolen that Co-Worker 1's complaints against him were false and that she had "subjected [him] to daily harassment," both physical and mental.  *See* TAC ¶¶ 32–33.  But far from failing to act, Plaintiff himself alleges that MoFo investigated the matter, the "allegations raised by Co-Worker

---

[7] In fact, Plaintiff provided another exhibit—an email thread from the day Plaintiff was fired—that implies the decision to fire Plaintiff originated with Hire Counsel.  *See* ECF No. 31-3 at 1 ("Jay was never contacted by Hire Counsel last night to inform him of [the] decision.").

1 were found to be untrue," and MoFo fired her.  *See id.* ¶¶ 34–36.  And it appears that MoFo's response was "prompt," resolving the dispute in just weeks.  *See id.* ¶¶ 31–32 (alleging the harassment by Co-Worker 1 took place after Plaintiff moved to a new conference room on or around September 20, 2019); ECF No. 31-4 (Co-Worker 1 testifying at a separate hearing on November 25, 2019, that she had been "forced out" of the firm); *Curry*, 195 F.3d at 660.

Even so, Plaintiff complains that the way MoFo approached the investigation perpetuated a hostile work environment on account of his race.  He claims that Nolen told him "not to appear in any areas were [sic] Co-Worker 1 was present," and that "another female co-worker (Co-Worker 2) [, with] whom [he] had a good working relationship . . . , over her own objections, was removed from [his] work area."  TAC ¶ 34.  Even though "the firm returned Co-Worker 2 to [Plaintiff's] conference room" after resolving Co-Worker 1's complaint, Plaintiff says, "the damage to [his] professional reputation and his mental state had already occurred" because "[t]hese actions sent a clear message to [Plaintiff] and his colleagues that the firm believed and treated [Plaintiff] as a predator to women."  *Id.*

However unfair these actions might seem to Plaintiff, they do not support a claim for hostile work environment based on his race.  *See Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 103–04 (D.D.C. 2010) (dismissing a hostile-work-environment claim when the plaintiff alleged, among other things, that "he was placed on administrative leave due to a false accusation").  Moreover, Plaintiff alleges nothing to suggest that MoFo's response to Co-Worker 1's complaint had anything to do with his race, only that Co-Worker 1's harassment itself was racially motivated.  *See* TAC ¶¶ 32–35.  The only plausible inference the Court can draw from these allegations is that MoFo took precautionary measures while investigating a complaint against Plaintiff, and after

18

expeditiously concluding that the complainant's accusations were unfounded, disciplined Plaintiff's accuser and returned the working arrangement to the status quo.

As for the remaining incidents, Plaintiff has not plausibly alleged that MoFo "knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry*, 195 F.3d at 660. He does not allege he reported the offensive behavior to anyone at MoFo or offer any other reason to infer that MoFo should have known about the behavior. His allegation that Harris must have known about the harassment because his office was nearby is rank speculation. *See* TAC ¶¶ 28–29. And in any event, as the Court has explained, Plaintiff has not plausibly alleged that Harris served in a supervisory capacity. In short, MoFo cannot be liable for a hostile work environment arising out of the conduct alleged because Plaintiff has not alleged a factual predicate for vicarious liability. And finally, even if it could, the sort of "disparaging remarks" and "other negative comments" Plaintiff alleges here "do not sufficiently demonstrate a significant level of offensiveness" to state a hostile-work-environment claim. *See Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009); *see also Goode v. Billington*, 932 F. Supp. 2d 75, 89 (D.D.C. 2013) ("[C]asual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action.") (quoting *Park v. Howard Univ.*, 71 F.3d 904, 906 (D.C. Cir. 1995)). Thus, the Court will dismiss Plaintiff's hostile-work-environment claims against MoFo.

### 2.    Hire Counsel

Plaintiff's claim against Hire Counsel fares no better. Along with incorporating the allegations against MoFo, *see* TAC ¶ 126, Plaintiff adds that Hire Counsel (1) failed to act after Plaintiff "reported acts of discrimination to supervisors"; (2) sent "malicious threatening emails of termination for contacting [MoFo] to request to work remotely for a legitimate purposes [sic], and similarly situated Caucasian co-workers were granted longer remote work authorization without

enduring similar threats"; and (3) "maliciously failed to inform [him] that [he was] discharged and not allowed to return to the office space thereby creating a security and possible police situation," all because of his race, *id.* ¶ 127.

Unlike with MoFo, Plaintiff *does* allege that he reported the allegedly discriminatory comments he endured in the conference room to Ayala at Hire Counsel.  Construing his claim generously, it appears Plaintiff aims to impute these coworkers' harassment to Hire Counsel for its failure to "implement prompt and appropriate corrective action."  *Curry*, 195 F.3d at 660; *see* TAC ¶ 127.  But Plaintiff does not allege that Hire Counsel employed the coworkers he reported, rather than MoFo or some other attorney placement agency.  Thus, Plaintiff has not plausibly alleged that Hire Counsel "was negligent in controlling working conditions" because he pleads nothing to support an inference that Hire Counsel had any authority to control those conditions in the first place.  *See Copeland*, 273 F. Supp. 3d at 76 (quoting *Vance*, 570 U.S. at 424).  And again, even if he had, the alleged remarks and comments cited by Plaintiff are insufficient to state a hostile-work-environment claim.

Plaintiff's remaining allegations get him nowhere.  The Court has already held that he has not plausibly alleged any discriminatory nexus between his race and Hire Counsel's decision to reject his request for remote work.  *See Floyd*, 85 F. Supp. 3d at 518.  Nor has he offered any reason to infer that Hire Counsel, with racial animus, refused to share news of his termination just to cause a scene when he arrived at MoFo's office on December 12.  His only allegation on this point is wholly conclusory.  *See* TAC ¶ 64 ("Due to the direct and indirect actions and omissions of Hire Counsel, Plaintiff on December 12, 2019, was subjected to further humiliation, intimidation, embarrassment, because of his race and color.").  So the Court will dismiss Plaintiff's hostile-work-environment claims against Hire Counsel, as well.

### C.      Wrongful Discharge

Plaintiff's last claim concerns his termination.  He alleges MoFo and Hire Counsel wrong-fully discharged him for reporting "perceived antitrust violations" to MoFo associates and a part-ner.  TAC ¶ 40.  Specifically, he claims he "became aware of a document he reasonably believed contained competitively sensitive information that had been improperly disclosed to T-Mobile US, Inc." during its merger with Sprint Corporation—MoFo's client.  *See id.*  Plaintiff says he "did not receive any further communication from [MoFo] about the matter," but the firm "summarily fired [him] within a week of reporting this potential violation."  *Id.*  Thus, he claims MoFo and Hire Counsel fired him "in retaliation for jeopardizing [MoFo's] valued reputation and subjecting the firm and client to possible sanctions and fines," *id.* ¶ 45, in violation of public policy embodied in federal and local antitrust laws, *id.* ¶ 97.[8]  Defendants respond that Plaintiff's failure to identify any law that plausibly prohibits the conduct he reported is fatal.  The Court agrees and will dismiss Plaintiff's wrongful-discharge claim.

Plaintiff invokes a narrow exception to the at-will employment doctrine: wrongful dis-charge in violation of public policy.  "[A]n at-will employee may have a claim sounding in tort for wrongful discharge if the employer's sole (or at least predominant) reason for terminating the em-ployee was the employee's refusal to break the law or was in some other respect contrary to a clear

---

[8] Plaintiff also tethers his wrongful-discharge claim to policies reflected in D.C. Rules of Professional Conduct 8.3(a) and 8.4.  *See* TAC ¶ 114–19.  In their motion to dismiss, Defendants offer a detailed argument explaining why his reliance on these rules is misplaced.  *See* ECF No. 34 at 43–45.  Plaintiff not only fails to respond to these arguments—he *expressly* declines to ad-dress them.  *See* ECF No. 43 at 19 n.8.  According to him, his citation to a D.C. Court of Appeals case in his *complaint*, *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 883–86 (D.C. 1998), obviated any need to respond—ignoring Defendants' argument distinguishing that case.  Thus, the Court will treat these arguments as conceded, and it will not address them further. *See Kone v. District of Columbia*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011) ("An argument in a dis-positive motion that the opponent fails to address in an opposition may be deemed conceded." (quoting *Rosenblatt v. Fenty*, 734 F. Supp. 2d 21, 22 (D.D.C. 2010)).

mandate of public policy." *Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 104 (D.C. 2018) (quotations omitted) (cleaned up). For a time, District of Columbia courts limited "the cause of action . . . to discharge for refusal to violate the law." *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 27 (D.D.C. 2015). The District of Columbia Court of Appeals eventually expanded the exception to cover employees who were "fired after acting in furtherance of a public policy," but the exception remains "very narrow." *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 248 (D.D.C. 2015) (quoting *Carl v. Children's Hosp.*, 702 A.2d 159, 161 (D.C. 1997)). To state a claim for wrongful discharge in violation of public policy, the plaintiff must point to "some identifiable policy that has been 'officially declared' in a statute or municipal regulation, or in the Constitution, . . . [and] a 'close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination.'" *Id.* (quoting *Davis v. Cmty. Alts. of Wash., D.C., Inc.*, 74 A.3d 707, 709–10 (D.C. 2013)).

Since *Carl* expanded the wrongful-discharge tort, courts have grappled with its outer bounds. The collective result is hardly a beacon of clarity. *See Perkins v. WCS Constr., Inc.*, No. 18-cv-751 (RC), 2020 WL 3128950, at *4 (D.D.C. June 12, 2020). Still, examples in which retaliatory firings have qualified for the exception are instructive, "including those of employees who threatened to disclose a pharmaceutical company's violations of drug-storage regulations, exposed potential violations of a non-profit employer's tax-exempt status, protested food contamination at a nursing home, reported a bribe, and aided an investigation into conduct prohibited by federal contracting regulations." *Leyden*, 83 F. Supp. 3d at 249 (collecting cases) (citations omitted).

Critically, "[t]he common denominator in all of these cases is the existence of specific laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained, whether or not the employer actually violated the law or regulation." *Leyden*, 83 F. Supp.

22

3d at 249.  To that end, to show the requisite "close fit" between a public policy and his termination, "it is not enough for a plaintiff to show only that [he] had [a] 'reasonable belief' that [his] employer was violating the law; [he] must show that [he] complained about an *actual violation*."  *Omwenga v. United Nations Found.*, No. 15-cv-786 (TSC), 2020 WL 5798428, at *5 (D.D.C. Sept. 29, 2020) (citing *Rosella v. Long Rap, Inc.*, 121 A.3d 775, 779 (D.C. 2015)) (emphasis added); *see also Herron v. Fannie Mae*, No. 10-cv-943 (RMC), 2016 WL 1177918, at *22 (D.D.C. Mar. 8, 2016), *aff'd*, 861 F.3d 160 (D.C. Cir. 2017) ("[T]he D.C. Court of Appeals has made clear that there is no "reasonable belief" defense in the context of a wrongful termination claim."); *cf. Bereston*, 180 A.3d at 106 ("This court has never held that an employee's reasonable (but wrong) belief that what her employer required her to do was illegal is enough to support a wrongful-discharge claim."). Plaintiff's complaint must at least "contain factual allegations that substantiate [his] conclusory assertions and beliefs regarding the illegality of [the employer's] request"—or, in this case, its violation of public policy.  *Bereston*, 180 A.3d at 107.  Otherwise, he cannot "establish[] the 'close fit' required by the D.C. Court of Appeals to recognize a new public policy exception" where the complained-of conduct is unmoored from "a specific public policy prohibiting [the employer] from engaging in the conduct [he] alleges."  *Leyden*, 83 F. Supp. 3d at 249.

With that framework in mind, Plaintiff has not shown a "close fit" between any clear, official public policy and the conduct he reported at MoFo.  He reported only his belief that MoFo had disclosed competitively sensitive information to another party undergoing a merger with its client.  *See, e.g.*, TAC ¶ 100.  But even if true, none of the authorities Plaintiff cites—the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), 15 U.S.C. § 18a and several D.C. Antitrust Act provisions, including D.C. Code §§ 28-4501(a)–(b), 28-4503, 28-4506, and 28-4508, TAC ¶ 97—express a clear policy against disclosing such information under the circumstances he

alleges here.  Put another way, he has not identified any "specific law[] or regulation[] that clearly reflect[s] a policy prohibiting the activity about which the employee complained."  *Leyden*, 83 F. Supp. 3d at 249.

Taking each in turn, first, Plaintiff argues that the HSR Act is an "identifiable policy declared in statute that prohibits the exchange of competitively sensitive information during the premerger notification period."  TAC ¶¶ 98–100.  As evidence, he offers the Federal Trade Commission guidance that "[e]xchanges of competitively sensitive information between competitors *could lead* to . . . violations of [the HSR Act.]"  *Id.* ¶ 99 (emphasis added).  That competitively sensitive information might, in undefined circumstances, "*lead to*" a violation of the Act—not even that doing so alone violates the Act—hardly makes out a clear statement of public policy.  And the Court is highly skeptical that agency guidance alone uprooted from any "specific statute or regulation" could qualify for the District of Columbia's public-policy exception.  *See Leydon*, 83 F. Supp. 3d at 248.  Accordingly, Plaintiff falls back on the only statutory grounding he can find: the requirements for a premerger notification and waiting period.  ECF No. 43 at 19 (citing 15 U.S.C. § 18a).  But it, too, does not per se proscribe sharing competitively sensitive information during that period.  So on this point, Plaintiff misses the mark by a mile.

Plaintiff's reliance on District of Columbia antitrust law is similarly faulty.  D.C. Code § 28-4501 announces a goal to "promote the unhampered freedom of commerce and industry . . . by prohibiting restraints on trade and monopolistic practices."  *See* TAC ¶ 101.  Sections 28-4502 and 28-4503 declare unlawful "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade" and any act to "monopolize, attempt to monopolize, or combine or conspire with any person or persons to monopolize any part of trade or commerce."  *See* TAC ¶¶ 102–03.  Section 28-4506, in turn, authorizes criminal penalties for violating §§ 28-4502 and

28-4503.[9]  *See* TAC ¶ 104.  But none of these provisions suggest that merely sharing competitively

sensitive information constitutes an unlawful "restraint on trade" or a "monopolistic practice."

And Plaintiff offers no response to MoFo's authority suggesting there is no antitrust violation when

"[parties to a merger] merely exchanged information."  ECF No. 34 at 40 (quoting *Kreuzer v. Am.*

*Acad. of Periodontology*, 735 F.2d 1479, 1487 (D.C. Cir. 1984)).

Plaintiff's response is, instead, twofold.  First, he points to a Department of Justice enforce-

ment action in which the complaint alleged that one party to a merger gave the other competitively

sensitive information.  *See* ECF No. 43 at 21 ¶ 41 n.11 (citing *United States v. Flakeboard Am.*

*Ltd.*, No. 14-cv-4949 (VC), 2015 WL 12656838 (N.D. Cal. Feb. 2, 2015)); ECF No. 40-2 at 8 ¶ 22.

But in that case, the Department alleged the defendant companies had formed a per se unlawful

agreement to reduce output and allocate customers.  ECF No. 40-2 at 4 ¶ 5.  Plaintiff alleges noth-

ing of the sort happened here and—to repeat—points to nothing suggesting that sharing competi-

tively sensitive information under these circumstances is itself unlawful.  Second, he argues that

exchanging the competitively sensitive information at issue before the merger's consummation

might have indicated "[unlawful] gun-jumping or transfer of beneficial ownership," which is a

factual question left for the jury.  ECF No. 43 at 20–21 ¶ 41.  But Plaintiff does not allege a suffi-

cient factual basis to suggest such illicit conduct was afoot.

In short, Plaintiff has not shown a sufficiently "close fit" between the conduct he reported

and any clear antitrust policy prohibiting that activity.  Indeed, Plaintiff does not even squarely

allege that MoFo violated any law—only that he suspected impropriety.  *See* TAC ¶ 38 (referring

---

[9] Earlier in the Third Amended Complaint, Plaintiff further identifies D.C. Code § 28-4508, which creates a civil cause of action for "[a]ny person who is injured in that person's business or property by reason of anything forbidden by this chapter."  But he mentions this statute only in passing and does not argue that it might reflect a policy prohibiting MoFo's conduct.  *See* TAC ¶ 97.

to "possible" antitrust violations); *id.* ¶ 40 (referring to "perceived" antitrust violations), *id.* ¶ 45 (referring to "possible" sanctions and fines); *id.* ¶ 46 (referring to "potential violations").  Under these circumstances, his wrongful-discharge claim cannot proceed.[10]

## IV.    Conclusion

For all these reasons, the Court will grant Defendants' Motion to Dismiss the Third Amended Complaint with prejudice.[11]  A separate order will issue.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 27, 2023

---

[10] Plaintiff recently moved the Court to schedule a Rule 26(f) conference.  *See* ECF No. 49.  Because the Court grants Defendants' motion to dismiss, it will also deny that motion and grant Plaintiff's related motion to decide ECF No. 49 on the papers.  *See* ECF No. 52.

[11] It is not clear to the Court whether Plaintiff could cure the deficiencies in his disparate-treatment claims by amendment, and in the typical such case, it would dismiss those claims without prejudice.  *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("A dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (cleaned up)).  But Plaintiff has already amended his complaint three times, and the deficiencies in those claims in the *Third* Amended Complaint were previously identified in Defendants' Motion to Dismiss Plaintiff's *Second* Amended Complaint.  *See* ECF No. 17 at 18–19 (moving to dismiss because Plaintiff "does not put forward any factual allegations to show that [his white coworkers] were similarly situated to him in a way that would potentially allow for a discriminatory inference").  Yet Plaintiff did not address them.  Leave to amend is not warranted where there has been "repeated failure to cure deficiencies by previous amendments."  *See Pietsch v. McKissack & McKissack*, 677 F. Supp. 2d 325, 328 (D.D.C. 2010).